

ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2010 JUL 20  AM 9: 16

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| MC ASSET RECOVERY LLC | § | |
| AS SUCCESSOR-IN-INTEREST | § | |
| TO MIRANT CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL NO. 4:06-CV-013-Y |
| | § | |
| COMMERZBANK AG, ET AL., | § | |
| | § | |
| Defendants. | § | |

## PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW
## WITH RESPECT TO DEFENDANTS' MOTION TO DISMISS
## PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE DISTRICT COURT:

The United States Bankruptcy Court submits its proposed findings of fact and conclusions of law with respect to the defendants' motion to dismiss this adversary proceeding pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure and Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.

### I. Procedural Background

### A. Mirant's Complaint And
### Commerzbank's Motion To Withdraw The Reference

Mirant Corporation ("Mirant"), a chapter 11 debtor, initiated this adversary proceeding by filing its original complaint on July 13, 2005. In its complaint, Mirant sought to avoid as fraudulent transfers certain payments made by Mirant to the defendants prior to Mirant's petition in bankruptcy. Mirant invoked this court's

jurisdiction pursuant to 28 U.S.C. § 1334. Its claims are core claims pursuant to 28 U.S.C. § 157(b)(2)(h).

Defendant Commerzbank AG ("Commerzbank")[1] responded to the complaint by moving the District Court to withdraw the reference of this adversary proceeding. In its motion, Commerzbank announced its intention to demand a jury trial, as well as its lack of consent to a jury trial in the bankruptcy court. Given these facts, Commerzbank insisted that withdrawal of the reference was mandated. Mirant responded by arguing that the reference should not be withdrawn because Commerzbank had waived its right to a jury trial pursuant to a contractual waiver provision.

In its order of March 29, 2007, the District Court[2] held that Mirant itself could not enforce the jury-trial waiver provision against Commerzbank but noted that it was possible that another party might attempt to enforce it. Accordingly, the District Court denied the motion to withdraw the reference without prejudice to Commerzbank's right to reurge it after the completion of all pre-trial proceedings. The District Court further held that if no other party to the waiver provision attempted to enforce it against Commerzbank, the motion to withdraw the reference would be granted. Since the date of the District Court's order, no other party has attempted to enforce the jury-trial waiver against Commerzbank.

---

[1] Commerzbank is a lender and the administrative agent for the following organizations: ABN AMRO Inc., Intesa San Paolo (formerly Banca Intesa), ING Bank, The Royal Bank of Scotland PLC, Credit Lyonnais, Danske Bank A/S, Australia and New Zealand Banking Group Limited, Barclays Bank, and BN Paribas.

[2] References to the "District Court" or the "Court" are to the United States District Court for the Northern District of Texas, Fort Worth Division.

### B.  MCAR'S Substitution As Plaintiff, Commerzbank's Motion To Dismiss, And The Court's Conversion Of Part Thereof To A Motion For Partial Summary Judgment

On December 20, 2006, MC Asset Recovery, LLC ("MCAR"), a litigation entity created by Mirant's plan of reorganization, was substituted as plaintiff in place of Mirant. MCAR filed its First Amended Complaint (the "amended complaint") on October 8, 2007.   Commerzbank moved to dismiss the amended complaint pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure.

In its motion, Commerzbank argued, among other things, that the court should dismiss MCAR's claims under section 544(b).  Section 544(b) permits a trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim." 11 U.S.C. § 544(b) (2010).  Commerzbank argued that the "applicable law" governing MCAR's claims was either New York Debtor and Creditor Law or section 18-2-22 of the Official Code of Georgia, both of which, it said, patently negate MCAR's right of recovery.  MCAR responded by saying that the applicable law in this case is either the Federal Debt Collection Procedures Act ("FDCPA") and/or the Uniform Fraudulent Transfer Act ("UFTA") as enacted by forty-one states, including the UFTA enacted by Georgia, which became effective on July 1, 2002.

In its argument in opposition to the motion to dismiss, MCAR acknowledged that if the court concluded that the FDCPA is not applicable law under section 544(b) and that section 18-2-22 of the Official Code of Georgia is the applicable law, its claims are barred.   But, MCAR also argued that this court could not make a choice-of-law determination on the basis of the pleadings.

On December 19, 2008, this court handed down its Order Converting Part of Defendants' Motions to Dismiss to Motions for Summary Judgment. There, the court preliminarily concluded that (1) the FDCPA is not applicable law under section 544(b), (2) to the extent that Georgia law is the appropriate law under a choice-of-law analysis, section 18-2-22 of the Official Code of Georgia, not the Uniform Fraudulent Transfer Act, is the applicable law of Georgia, and (3) that MCAR could not rely upon the laws of forty-one states to state a claim under section 544(b).

The court agreed with MCAR, however, that it could not make a choice-of-law determination based upon the pleadings in this adversary proceeding, even as supplemented by extensive matters of record in the Mirant bankruptcy case. Because of the potentially dispositive nature of the court's ruling on choice of law, the court found that it would be consistent with judicial economy and the efficient administration of justice to convert the choice-of-law issue from a motion to dismiss under Rule 12(b)(6) to a motion for summary judgment under Rule 56. The court effected that conversion by order of December 19, 2008.

The parties conducted significant discovery on the choice-of-law issue. Upon completion of that discovery, MCAR argued that the "applicable law" was New York Debtor and Creditor Law, not section 18-2-22 of the Official Code of Georgia.[3] Commerzbank now argues that the choice-of-law analysis points to Georgia and, hence,

---

[3] The defendants and the court agree that by urging the application of New York law in response to the court's order converting the choice-of-law issue to a motion for summary judgment, MCAR has not waived its argument that the FDCPA and Georgia's Uniform Fraudulent Transfer Act are the applicable law under section 544(b). *See* Order Granting Unopposed Motion for Clarification Regarding Draft Proposed Findings of Fact and Conclusions of Law with Respect to Defendants' Motions to Dismiss Plaintiff's First Amended Complaint (Dec. 24, 2008).

to section 18-2-22 of the Official Code of Georgia. The court heard oral argument on the motion for summary judgment on February 2, 2010.

### II. Application Of The Procedures Set Forth In Rule 9033 Of The Federal Rules Of Bankruptcy Procedure To This Matter

The complex procedural history of this proceeding raises a question as to the type of relief that this court may enter in response to Commerzbank's motion to dismiss. That is, should this court enter an order granting or denying the motion (and thus subject the parties to the appellate procedures set forth in 28 U.S.C. § 158), or should it submit proposed findings of fact and conclusions of law to the District Court? Section 157 of Title 28 does not answer this question.

Given the District Court's ruling that, at the appropriate time and under the appropriate circumstances, it will grant a motion to withdraw the reference, this court believes that it is appropriate to submit to the District Court proposed findings of fact and conclusions of law with respect to the motions. The closest procedural corollary is found in section 157(c)(1) of Title 28. That section provides that "a bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11." 28 U.S.C. § 157(c)(1) (2010). In that proceeding, the bankruptcy judge must submit proposed findings of fact and conclusions of law to the District Court, with any final order or judgment to be entered by the District Judge after considering the proposed findings and conclusions and after reviewing de novo those matters as to which any party has timely and specifically objected. *Id.*

This adversary proceeding is a core proceeding, but, because of Commerzbank's demand for a jury trial and its lack of consent to trial in the bankruptcy court, this court questions its ability to enter a final order on a dispositive motion. Bankruptcy Rule

9029(b) permits the court to adopt procedures consistent with federal law and the rules of bankruptcy procedure when there is no controlling law. FED. R. BANKR. P. 9029(b). It is consistent with 28 U.S.C. § 157(c)(1), Bankruptcy Rule 9033 (which implements section 157(c)(1)), judicial economy, and the efficient administration of justice to submit to the District Court proposed findings of fact and conclusions of law with respect to the motions. So, this court adopts the procedures in Rule 9033 with respect to the motions before it.

### III. Factual Background

### A. The Power Island Project

Mirant owns and operates domestic and international energy assets and power companies. Mirant Asset Development and Procurement B.V. ("MADP") was an indirect, wholly-owned subsidiary of Mirant. In December 2000 MADP entered into a Master Equipment Purchase and Sale Agreement (the "Master Agreement") with General Electric International, Inc. and General Electric Company (collectively, "GE") to acquire nine power islands. Power islands are power generation structures that contain multiple turbines and heat recovery devices. The power islands were to be used at electric generating project sites in Europe. Mirant executed and delivered to GE a guaranty in which it guaranteed the obligations of MADP to GE under the Master Agreement and certain related agreements.

The financing for the purchase of the power islands was accomplished via a series of off-balance-sheet transactions. First, an entity called European Power Island Procurement B.V. ("EPIP") was created to act as the owner of the power islands. EPIP

was owned by Stitching European Power Island (the "Foundation").   EPIP and the Foundation were independent from Mirant and MADP.

Next, MADP entered into a bridge financing transaction with Westdeutsche LandesBank Girozentrale ("West LB").   The bridge financing was then refinanced through the "1.1 Billion Euro Power Island Acquisition Facilities," which consisted of two facilities.   Facility I was a revolving facility and the source of funding for progress payments under the Master Agreement.   Facility II was to be used only if Facility I was fully drawn or to fund certain early funding events.   Commerzbank AG, ABN AMRO, Inc., Intesa San Paolo (formerly Banca Intesa), ING Bank, The Royal Bank of Scotland PLC, Credit Lyonnais, Danske Bank A/S, Australia and New Zealand Banking Group Limited, Barclays Bank PLC, and BNP Paribas (collectively, "Commerzbank") acted as lenders or investors with respect to the facilities.

On February 15, 2001, MADP and West LB entered into an agreement that assigned MADP's interest in the Master Agreement to West LB.   Later, West LB and EPIP entered into an agreement that assigned West LB's interest in the Master Agreement and certain other contracts to EPIP.

After MADP assigned its interest in the Master Agreement it no longer owned any rights in either the Master Agreement or the power islands.   Nevertheless, MADP and EPIP entered into an agreement pursuant to which MADP would administer the acquisition and construction of the power islands in accordance with the terms of the Master Agreement.   Additionally, MADP, EPIP, the Foundation and Commerzbank entered into certain participation agreements that required MADP to acquire the power islands from EPIP.   In connection with the participation agreements, Mirant executed and

delivered a guaranty dated May 25, 2001, in favor of Commerzbank, pursuant to which Mirant guaranteed all amounts payable by MADP under the various financing agreements.

According to the amended complaint, MADP had three options with respect to each power island:  (a) it could purchase EPIP's interest in each power island and its related interest in the Master Agreement; (b) not later than six months prior to the scheduled shipment date for a given power island, it could remarket the power island and the related interest in the Master Agreement and pay EPIP an amount of up to approximately 89.9% of the project costs as well as remarketing proceeds; or (c) not later than three months prior to the shipment date for a given power island, it could enter into a five-year lease of the power island.

MADP chose none of these options, but instead terminated its rights with respect to all of the power islands.   Nevertheless, Mirant, either directly or via certain subsidiaries, paid Commerzbank $E136,873,950 in connection with the power islands.

MCAR alleges that neither Mirant nor MADP received anything of value in return for the guaranty and payments made by Mirant.  It further alleges that when the guaranty was delivered to Commerzbank and the funds described above were transferred, (a) Mirant was insolvent or was rendered insolvent by such transactions, (b) Mirant should have reasonably believed that it would incur debts beyond its ability to pay when due; and (c) Mirant was engaged or about to engage in business or transactions for which its remaining assets were unreasonably small.

### B.  Mirant's Bankruptcy, The Lawsuit, And The Creation Of MCAR

On July 14, 2003, Mirant and numerous affiliated entities filed voluntary petitions under chapter 11 of the Bankruptcy Code.  On July 13, 2005, Mirant commenced this proceeding by filing a complaint alleging that the guaranty it delivered and the payments it made to Commerzbank were voidable as fraudulent transfers.  Mirant's plan was confirmed on December 9, 2005.  Pursuant to that plan, MCAR was created to pursue litigation for the benefit of Mirant's creditors and shareholders.  On December 20, 2006, MCAR was substituted as plaintiff in this adversary proceeding.  It filed its amended complaint on October 8, 2007.  Commerzbank filed its motion to dismiss the amended complaint on December 17, 2007.  This court converted part of the motion to dismiss (the choice-of-law issue) to a motion for partial summary judgment on December 19, 2008.

### IV.  Standards For The Motion To Dismiss And The Motion For Summary Judgment

#### A.  Standards For The Motion To Dismiss

When considering a motion to dismiss under Rule 12(b)(6), a court is to construe the complaint charitably, accepting as true all well-pleaded factual allegations and drawing reasonable inferences from those facts in favor of the non-moving party.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The factual allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* (citations omitted).

#### B.  Standards For The Motion For Summary Judgment

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(C).

When reviewing a motion for summary judgment, the court views the facts and the inferences therefrom in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The movant bears the initial burden of stating the basis for its motion and identifying evidence that shows that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant carries its burden, the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Here, Commerzbank moved to dismiss MCAR's claims under Rules 12(b)(1) and 12(b)(6); it did not move for summary judgment. The court converted the choice-of-law issue in Commerzbank's motion to dismiss to a motion for summary judgment. Even though Commerzbank did not voluntarily assume the status of movant under a motion for summary judgment, it still bears the burdens of a movant in the procedural context of this case.[4]

## V. Discussion

### A. First Proposed Conclusion:
### If Mirant's Creditors Have Been Paid In Full,
### MCAR Lacks Standing To Prosecute Claims Under 11 U.S.C. § 544(b)

Commerzbank contends that MCAR's claims must be dismissed pursuant to Rules 12(b)(1) and 12(b)(6) because creditors of Mirant were paid in full under its plan and, as such, MCAR has no standing to pursue fraudulent transfer claims on their behalf. Commerzbank's argument is based upon unusual facts.

---

[4] Despite its allocation of the burden to Commerzbank, the court's proposed findings and conclusions with respect to the choice-of-law analysis would be the same even if MCAR bore the burden on this issue.

In its plan of reorganization, Mirant provided that unsecured creditors would receive New Mirant stock and an interest in the recoveries of MCAR.  Before Mirant confirmed its plan, Judge Michael Lynn conducted a lengthy valuation hearing, after which he concluded that Mirant was solvent.  Judge Lynn's valuation, coupled with rising prices in the energy market, generated significant interest in Mirant claims and equity.  By the effective date of Mirant's plan, New Mirant's stock price supported an argument that unsecured creditors had been or would be paid in full on the basis of the stock alone.

The issue of whether creditors had been paid in full began to arise in Mirant's bankruptcy case.  Professionals who filed fee applications sought to justify their fees on the ground, among others, that creditors had been paid in full.  *In re Mirant Corp.,* 354 B.R. 113, 128-29 (Bankr. N.D. Tex. 2006).  When Mirant sought approval of a settlement with Potomac Electric Power Company ("Pepco"), Mirant argued that certain objectors had no standing to oppose the settlement because their claims had been paid in full.  *In re Mirant Corp.*, 348 B.R. 725, 732-33 (Bankr. N.D. Tex. 2006).

Mirant's paid-in-full argument created a problem for MCAR.  MCAR's litigation assets included not only the causes of action that are the subject of this adversary proceeding, but a fraudulent transfer claim against The Southern Company, which was then pending in the United States District Court for the Northern District of Georgia.  MCAR, which was represented by its own counsel, became concerned that Mirant's paid-in-full argument would undermine MCAR's causes of action.  On July 5, 2006, MCAR appeared at the hearing on Mirant's motion to settle with Pepco and urged Judge Lynn to exercise caution in ruling on the paid-in-full issue.  According to MCAR, such caution

not only was necessary to preserve MCAR's claims but was justified because, by MCAR's calculations, creditor recoveries on the effective date of the plan were closer to 95%, rather than 100%.

Judge Lynn approved Mirant's settlement with Pepco. In doing so, he ruled that the objecting creditors had standing to object under section 1109 of the Bankruptcy Code, even though creditors had been "satisfied in full" by Mirant's plan. Judge Lynn elaborated on what he meant by "satisfied in full":

> The court here uses the phrase "satisfied in full" to mean that each holder of a Class 3 claim received "property of a value, as of the effective date of the [P]lan, equal to the allowed amount of such claim. . . ." Code § 1129(b)(2)(B)(i). That the court assesses the value of the stock issued by Mirant Corp. for purposes of that section should have no bearing on whether creditors are deemed fully satisfied for other purposes, including in litigation with Southern. The court understands the concern expressed at the commencement of the July 5, 2006, hearing that Southern (despite its anxiety to avoid the jurisdiction of this court) may find helpful and seek to use findings made in this court to block litigation against it in Georgia. Even assuming theories of issue preclusion may be so invoked by Southern, the courts in Georgia will no doubt recognize the distinction between "value" for purposes of a plan and "value" in determining any liability Southern may have by reason of misconduct respecting Debtors. *Cf.* Code § 506(a) ("value shall be determined in light of the purpose of the valuation"). It is especially important in any determination of value to remember that most creditors in Debtors' cases were not paid in cash but rather received stock.

*In re Mirant Corp.*, 348 B.R. at 731 n.15.

Based upon this record and other similar comments by Judge Lynn, Commerzbank contends that it is the law of the case that creditors of Mirant have been paid in full. So, Commerzbank argues that there is no injury to be redressed by this adversary proceeding, and in the absence of any such injury, MCAR has no standing to prosecute its claims.

The issue of whether payment in full vitiates standing under section 544(b) is not new. In three cases where the issue has been broached, the courts have concluded that payment in full does not deprive the plaintiff of standing. *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 807-08 (9th Cir. 1994); *Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 605 (B.A.P. 8th Cir. 2003) (*aff'd*, 376 F.3d 819 (8th Cir. 2004)); *MC Asset Recovery v. The Southern Company*, No. 1:06-CV-0417, 2006 WL 5112612, at *4 (N.D. Ga. Dec. 11, 2006) *(Southern I)*.

The courts that have held that standing is not affected by payment in full rely upon section 544(b) itself. According to those courts, standing is tested at case commencement. *Acequia*, 34 F.3d at 807; *Stalnaker*, 295 B.R. at 605. So, if a creditor with a viable claim existed when the bankruptcy petition was filed, the standing requirement is satisfied. *Acequia*, 34 F.3d at 807. Notably, the District Court for the Northern District of Georgia agreed with this analysis when ruling on the defendant's motion for summary judgment as to MCAR's claims against The Southern Company. *Southern I*, 2006 WL 5112612, at *4.

The *Stalnaker* courts also rely upon section 550 of the Bankruptcy Code. They note that under section 550, recoveries under section 544(b) are preserved for the benefit of the estate, not just for the benefit of creditors. *Stalnaker*, 376 F.3d at 823; *Stalnaker*, 295 B.R. at 606. So, according to *Stalnaker*, the fact that creditors have been paid in full should not impede recovery as long as there is some benefit to the estate. *Stalnaker*, 295 B.R. at 607.

This court respectfully submits that while focusing on sections 544 and 550 of the Bankruptcy Code, the foregoing cases lost sight of Article III of the Constitution. The

Constitution limits a federal court's jurisdiction to actual cases or controversies. U.S. CONST. art. III, § 2, cl. 1; *Raines v. Byrd*, 521 U.S. 811, 818 (1997). In order to have standing, and therefore a justiciable case or controversy, the plaintiff must show: (1) that it has suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) it is likely that the injury will be redressed by judicial action. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Even if a defensible argument for standing could be made under sections 544 and 550 of the Bankruptcy Code, "Congress cannot by statute vest the federal courts with jurisdiction to hear lawsuits that do not present a case or controversy under Article III or that are otherwise not within the limited jurisdiction which Article III grants the federal courts." *Gonzales v. Gorsuch*, 688 F.2d 1263, 1270 (9th Cir. 1982) (Wallace, J., concurring).

Despite the presence of a triggering creditor as of case commencement, if the debtor's creditors have been paid in full during the course of the debtor's case or pursuant to plan confirmation, any injury to those creditors is purely conjectural or hypothetical. *See Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) (per curiam) ("If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed."); *Trautz v. Wiseman*, 846 F. Supp. 1160, 163-64 (S.D.N.Y. 1994) ("Even where a case presents a live controversy at the time of filing, subsequent developments that extinguish the controversy will divest a federal court of jurisdiction and require that the case be dismissed as moot." (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974))). So, section 544(b)'s establishment of standing as of the date of case commencement is no

answer to the constitutional requirement that a plaintiff demonstrate an actual, concrete injury in order to go forward.

Likewise, section 550 cannot supply standing in the absence of actual injury to creditors. It is the nature of bankruptcy that plans of reorganization comprise a series of tradeoffs. One class of creditors may make concessions to another in order to secure the latter's support for plan confirmation. Creditors of an insolvent company may agree that equity receive some form of compensation even though equity would receive nothing in a cramdown scenario. By carving the estate in this manner, it is possible that interests that could never have benefited from certain litigation recoveries under state law would nevertheless benefit from those recoveries under a confirmed plan. So it is here where Mirant's former shareholders are to receive 50% of MCAR's litigation recoveries. Still, this carving of the estate does not cure a standing defect. In the absence of any injury to creditors, it is irrelevant that there are parties who stand to benefit from fraudulent transfer recoveries.

The District Court for the Southern District of New York addressed the paid-in-full defense in *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80, 89 (S.D.N.Y. 2008). In *Adelphia*, creditors were paid in full in cash under the plan, and Adelphia's plan created a liquidation trust to pursue recoveries under sections 544(b) and 548. *Id.* at 86. As here, the defendants in those adversary proceedings attacked the trust's standing to pursue the avoidance claims. *Id.* at 85.

Unlike the courts that previously addressed the paid-in-full defense, the *Adelphia* court directly addressed the Article III impediment. It noted that in order "to establish the existence of an actual case or controversy sufficing to create federal court jurisdiction, a

litigant 'must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Id.* at 94-95 (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)). Because all of Adelphia's creditors had been paid in full, the court found that the litigation trust was not able to allege an injury that was likely to be redressed and, as such, had no standing to sue. *Id.* at 95.

MCAR argues, however, that denying it standing here would be patently unfair because litigation recoveries were part of the bargained-for consideration that was integral to Mirant's plan of reorganization. Additionally, because creditors were receiving stock instead of cash, there was no assurance that creditors would receive full payment on the distribution date. Thus, according to MCAR, the right to litigation recoveries acted as a hedge to compensate creditors for the risk of price fluctuation in the stock. Moreover, MCAR argues that if payment in full precludes access to section 544(b), debtors will delay filing plans of reorganization until completing all potential litigation, which contravenes the Bankruptcy Code's goal of quick and equitable reorganization. *See Acequia*, 34 F.3d at 808.

Despite the persuasiveness of MCAR's arguments, they are merely policy arguments. No policy, no matter how well-grounded in equity, can overcome the constitutional defect of absence of case or controversy. If Mirant's creditors have been paid in full, there is no federal jurisdiction in this adversary proceeding.

### B. Second Proposed Conclusion:
### It Is Not Law Of The Case That Mirant's Creditors Were Paid In Full And
### The Court Should Not Estop MCAR From Denying So

#### 1. Law Of The Case

Having established that payment in full vitiates standing under section 544(b), the court now addresses Commerzbank's arguments that it is the law of the case that Mirant's creditors have been paid in full or that, at a minimum, MCAR should be estopped from denying so.

"The rule of law of the case is a rule of practice, based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter." *United States v. U.S. Smelting Ref. & Mining Co.*, 339 U.S. 186, 198 (1950). The decision to apply law of the case is discretionary, not mandatory. *Cont'l Ill. Nat'l Bank & Trust Co. v. Wooten (In re Evangeline Ref. Co.)*, 890 F.2d 1312, 1321-22 (5th Cir. 1989).

It is not appropriate to apply law of the case under these facts for at least four reasons. First, Judge Lynn did not intend his "satisfied-in-full" comments to have preclusive effect. When the issue was broached in Mirant's motion to settle with Pepco, Judge Lynn specifically said that his "satisfied-in-full" assessment "should have no bearing on whether creditors are deemed fully satisfied for other purposes, including in litigation with Southern." *In re Mirant Corp.*, 348 B.R. at 731 n.15.

Second, Reorganized Mirant and MCAR are separate entities. While their interests may overlap on certain issues, they conflict on others. One of the areas in which their interests do not coincide is the paid-in-full issue. As the record reveals, after confirmation, it was tactically advantageous for Mirant to argue that creditors had been paid in full, but disadvantageous for MCAR to do so. MCAR has consistently argued

that creditors were not paid in full on the effective date. It would be unfair to saddle MCAR with Mirant's position on the paid-in-full issue when MCAR assiduously opposed that position in the bankruptcy case.

Third, MCAR had questionable standing to appear in the matters in which Judge Lynn made his observations. Because MCAR's powers are limited by the plan and its governing trust instrument, it had questionable authority to oppose settlement agreements or the award of professional fees in the bankruptcy case. Given its limited charter, MCAR could ask for restraint or qualification in any ruling by Judge Lynn on the paid-in-full issue, but its real or practical ability to litigate that issue was tenuous at best.

Fourth, the record is unclear that creditors have been paid in full. In its motion, Commerzbank focuses upon the effective date of the plan as the date on which all creditors were paid in full. But, the problem with fixing the effective date as the payment date is that Mirant's plan specifically contemplated that not all creditors would be paid on the effective date. According to Article XI of the plan, creditors were to receive plan distributions on the effective date or when their claims became Allowed Claims. Paragraph 11.1 of the plan gave the disbursing agent up to 180 days *after* the effective date to object to claims.

Two logical inferences flow from these facts. First, it is possible, if not likely, that some claims, if not many claims, only became Allowed Claims after the effective date. If so, those holders of Allowed Claims received New Mirant stock after the effective date. So, it is also possible that some creditors received less than payment in full based upon Mirant's stock price as of their respective distribution dates. Because it is logical to infer that all creditors did not receive payment in full on the effective date, and

because logical inferences must be drawn in MCAR's favor when considering a motion to dismiss, the court simply cannot conclude that all creditors were paid in full on the effective date.

## 2. Judicial Estoppel

Judicial estoppel prevents a party from taking a position in a legal proceeding that is contrary to a position previously taken in an earlier proceeding. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The purpose of judicial estoppel is to prevent parties from "playing fast and loose" with the court. *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 205 (5th Cir. 1999).

Because MCAR should not be held accountable for Mirant's paid-in-full arguments, MCAR's current position on the payment of creditors is consistent with its prior assertions on the topic. Moreover, the court does not perceive that MCAR has played fast and loose with this court or with Judge Lynn. Accordingly, the Court should not estop MCAR from denying that creditors have been paid in full.

## C. Third Proposed Conclusion:

## The FDCPA Is Not Applicable Law Under Section 544(b)

MCAR's case depends on its ability to avoid the guaranty to Commerzbank. MCAR concedes that the guaranty provides value for the payments made by Mirant to the defendants. Consequently, unless the guaranty is avoided, the payments made pursuant to it are insulated from attack. Mirant delivered the guaranty more than one year prior to its petition in bankruptcy; thus, section 548 provides no basis for its avoidance. Therefore, MCAR must rely on an "applicable law" that it can access via section 544(b).

MCAR initially points to the Federal Debt Collection Procedures Act (the "FDCPA") as applicable law. The FDCPA was enacted to provide a more consistent means of debt collection for the United States and "bring an end to the . . . situation whereby a crazy patchwork of laws in the fifty states dictate debt collection remedies available to [the government] in collecting Federal debts." *Pierce v. United States*, 232 B.R. 333, 335 (E.D.N.C. 1999). Commerzbank contends that the FDCPA is accessible only by the United States and may not be used by trustees under section 544(b).

This issue was addressed by the United States District Court for the Northern District of Georgia (the "Georgia District Court") in *MC Asset Recovery, LLC v. The Southern Company*, No. 1:06-CV-0417 (N.D. Ga. July 7, 2008) (*Southern II*) (order on motion to establish governing law). There, the Georgia District Court held that the FDCPA is not "applicable law" under section 544(b) because that act represents the exclusive civil procedures for the United States, and no other entity, to collect debts owed to it and to avoid fraudulent transfers as to those debts. *Southern II*, at 4, 8. The court's ruling was based upon 28 U.S.C. § 3001(a), which states, "This chapter provides the exclusive civil procedures for the United States to (1) recover a judgment on a debt; or (2) to obtain, before judgment on a claim for a debt, a remedy in connection with such claim."

MCAR contends that the Georgia District Court erred because section 3001(a) only applies to actions in which the United States attempts to recover a debt or exercise a pre-judgment remedy. According to MCAR, the post-judgment remedy of fraudulent transfer avoidance is found in section 3304, and that section does not purport to limit avoidance actions exclusively to the United States.

This court disagrees.  Section 3304 provides that transfers avoidable under the FDCPA are fraudulent "as to a debt to the United States."  28 U.S.C. § 3304(a), (b) (2009).  Likewise, section 3306(a) provides that the remedies found in subchapter D (those relating to "Fraudulent Transfers Involving Debts") are available to the United States.  28 U.S.C. § 3306(a).  Based upon the plain language of these sections, it could hardly be argued that outside of bankruptcy, creditors other than the United States could use the avoidance procedures set forth therein to redress private wrongs.  *See TWU Local 555 v. Sw. Airlines Co.*, No. 3:02-CV-0554P, 2002 WL 31245372, at *2 (N.D. Tex. Oct. 1, 2002) (holding that the key inquiry in determining whether a private right of action may be implied under a certain federal law is "whether Congress, expressly or by implication, intended to create a private right of action").  Accordingly, this court agrees with the Georgia District Court that the FDCPA provides the "exclusive civil procedures for the United States, and no other entity, to utilize in collecting its debts."  *Southern II*, at 8.

The Georgia District Court next concluded that the FDCPA is not applicable law under section 544(b) because the FDCPA expressly provides that it is not to be construed to "supersede or modify the operation of Title 11."  *Id.*  (citing 28 U.S.C. § 3003(c)).  According to the Georgia District Court, United States Representative Brooks clarified the meaning of this phrase by explaining that this provision was "carefully worded to make clear that the [FDCPA] would have absolutely no effect on the Bankruptcy Code; even provisions of the Bankruptcy Code making reference to non-bankruptcy law are to be read as if this act did not exist."  *Southern II*, at 8 (citing 136 CONG. REC. H13288-02 (1990) (statement of Rep. Brooks)).

MCAR argues that this court is not authorized to consider such legislative history unless the statute is ambiguous, and, in that instance, it may only consider committee reports, not statements of one member or casual comments from floor debates.

This court is unable to ascertain a consistent rule on the weight, if any, to be given to legislative history. *Compare Dist. of Columbia v. Heller*, 128 S.Ct. 2783, 2841 (2008) (noting that legislative history should be given little, if any, weight), *with Exxon Mobil Corp. v. Allapattah Servs. Inc.,* 545 U.S. 546, 568 (2005) (stating that legislative history may be used to illuminate otherwise ambiguous terms in the statute). Indeed, even those courts that look to legislative history do not agree on which portions of a bill's legacy constitute permissible legislative history for judicial consideration. *Compare Internal Rev. Serv. v. Teal (In re Teal)*, 16 F.3d 619, 621 n.4 (5th Cir. 1994) (treating congressman's floor statement as persuasive evidence of congressional intent) (citation omitted), *and Harding v. Dep't of Veterans Affairs*, 448 F.3d 1373, 1377 n.3 (Fed. Cir. 2006) (stating that the court may rely on the remarks of an introducing sponsor as an indicator of congressional intent, at least in the absence of contradictory evidence) (citations omitted), *with Garcia v. United States*, 469 U.S. 70, 76 (1984) (stating that if a court resorts to legislative history, the authoritative source for legislative intent is the committee report on the bill, not the statement of one member), *and Weinberger v. Rossi*, 456 U.S. 25, 35 n.15 (1982) (stating "contemporaneous remarks of a sponsor of legislation are certainly not controlling in analyzing legislative history").

This court shares MCAR's skepticism when it comes to regarding the comments of a single representative as a manifestation of the intent of Congress as a whole. The phrase "shall not be construed to supersede or modify . . . Title 11" may have meant one

thing to Representative Brooks and something else to other members of Congress. It is possible that other members gave no significant deliberative thought to the meaning of the phrase at all. *See* Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 Duke L.J. 511, 517 (1989) (opining that the "quest for 'genuine' legislative intent is probably a 'wild-goose chase'" because it is likely "Congress . . . didn't think about the matter at all"). Consequently, while this court takes no issue with the Georgia District Court's acceptance of Representative Brooks's comments as some manifestation of legislative intent, his comments form no part of this court's proposed conclusions.

The Georgia District Court also held that construing the FDCPA to be applicable law under section 544(b) would modify Title 11 by greatly expanding the intended reach of section 544(b). *Southern II*, at 8-9. According to the Georgia District Court, because the United States is frequently a creditor in many bankruptcy cases due to taxes owed by debtors, section 544(b)'s reach would be extended well beyond what was intended by Congress if the FDCPA were construed to be applicable law. *Id.* at 9. Additionally, the Georgia District Court found that Title 11 would be expanded by grafting the FDCPA's six-year statute of limitations upon the Bankruptcy Code's existing fraudulent transfer framework. *Id.* The defendants urge this court to adopt those holdings.

This court respectfully disagrees with the notion that the FDCPA would supersede or modify the operation of Title 11 if it were construed to be applicable law under section 544(b). The court does not believe that the operation of Title 11 would be modified at all by making the FDCPA accessible to bankruptcy trustees. Granted, allowing a bankruptcy trustee to use the FDCPA might allow him to reach transfers that otherwise would be

beyond his reach.  Still, this does not supersede or modify the operation of Title 11.  This can be demonstrated by comparing the effect of Congress's enactment of the FDCPA with Georgia's adoption of the Uniform Fraudulent Transfer Act.

States routinely modify their fraudulent transfer laws just as Georgia did in July 2002 when it replaced section 18-2-22 with the Uniform Fraudulent Transfer Act.  By substituting one act for the other, Georgia may have liberalized the ability of creditors to avoid fraudulent transfers and, concomitantly, the rights of a bankruptcy trustee to avoid such transfers under section 544(b).  Few would argue, however, that by expanding avoidance rights under state law, Georgia superseded or modified the operation of Title 11.

Just as Georgia could not supersede or modify the operation of section 544(b) of Title 11 by changing its fraudulent transfer laws, Congress did not supersede or modify the operation of Title 11 by enacting the FDCPA, even assuming it could be construed to be applicable law.  This is true even if the FDCPA could be said to expand the trustee's power to avoid fraudulent transfers.

This court also questions whether construing the FDCPA to be applicable law would dramatically expand the reach of section 544(b).  Even before the enactment of the FDCPA, bankruptcy trustees could look to the IRS's standing as an unsecured creditor in many bankruptcy cases and, by using state fraudulent transfer laws, exercise avoidance powers pursuant to section 544(b).  *See, e.g., Cambridge Meridian Group, Inc. v. Conn. Nat'l Bank (In re Erin Food Servs., Inc.)*, 117 B.R. 21, 25 (Bankr. D. Mass. 1990).  Construing the FDCPA to be applicable law under section 544(b) might add another

source to trigger that section's avoidance powers, but the impact of adding that source is open to conjecture.

Although it could be argued that giving a trustee access to a six-year statute of limitations under the FDCPA expands the trustee's avoidance powers under Title 11, the same could be said of practically any state statute that is accessible via section 544(b). If the benchmark for the "Code's existing fraudulent transfer framework" is the two-year period found in section 548,[5] then practically all state fraudulent transfer laws would modify Title 11 because their avoidance periods routinely exceed that limitation.[6] Even so, few would consider these statutes to supersede or modify Title 11.

MCAR argues that the Georgia District Court's failure to conclude that the FDCPA is applicable law under section 544(b) is ironic because such a construction itself impermissibly modifies Title 11. According to MCAR, by categorically excluding the United States as a creditor who may trigger avoidance under 544(b), the Georgia District Court did precisely what 28 U.S.C. § 3003(c) said it could not do.

MCAR's argument has some initial appeal. After all, if (1) the United States is an unsecured creditor and (2) the FDCPA is the exclusive authority that permits the United States to avoid transfers in order to satisfy its claims, then (3) any ruling that the FDCPA

---

[5] Section 548's avoidance period was one year when Mirant filed its petition in bankruptcy.

[6] *See, e.g.*, TEX. BUS. & COM. CODE ANN. § 24.010(a)(1) (Vernon 2009) (four-year statute of limitations, or one year after the transfer was or could have reasonably been discovered); GA. CODE ANN. § 18-2-79 (2009) (four-year statute of limitations, or one year after the transfer was or could have reasonably been discovered); N.Y.C.P.L.R. § 213(8), (McKinney 2009) (greater of six years from the date the cause of action accrued or two years from the time the plaintiff discovered the fraud, or could with reasonable diligence have discovered it).

is not applicable law would modify section 544(b) by excluding the United States as a triggering creditor.

An initial hurdle encountered by MCAR is that section 544(b)'s avoidance powers are not just dependent upon the existence of an unsecured creditor with standing to avoid the transfer, but also upon the existence of "applicable law" that would permit a creditor to pursue avoidance. MCAR responds by arguing that the FDCPA is such "applicable law" because of the broad construction given a similar phrase in *Patterson v. Shumate*, 504 U.S. 753 (1992). There, the Court held that the phrase "applicable non-bankruptcy law" in section 541(c)(2) of Title 11 refers to federal law as well as state law. *Id.* at 758. It further held that Congress, when it decided to do so, knew how to restrict the scope of "applicable non-bankruptcy law" to state law and did so with some frequency. *Id.* at 758. MCAR argues that because the phrase "applicable law" includes federal law as well as state law, then by the plain language of section 544(b), the FDCPA is applicable law under that section.

Section 544(b), however, is not the last word on Congress's intent when it comes to resolving the question of whether the FDCPA is applicable law under Title 11. Instead, the FDCPA itself not only is the most recent manifestation of congressional intent on that issue, but also the strongest.

Again, the avoidance powers in the FDCPA are exercisable by the United States solely for the benefit of the United States. Nothing in subchapter D of the FDCPA manifests any intent by Congress to benefit parties other than the United States. Under MCAR's theory, however, the beneficiaries under the FDCPA would be expanded to include every unsecured creditor of Mirant's bankruptcy estate.

Moreover, under section 3306 of the FDCPA, transfers may be avoided "to the extent necessary to satisfy the debt to the United States." 28 U.S.C. § 3306(a)(1). But, according to MCAR, once the FDCPA is construed to be applicable law under section 544(b), the scope of avoidance is vastly expanded. According to MCAR, once a transfer is avoided, under the rule of *Moore v. Bay*, 284 U.S. 4, 5 (1931), the scope of avoidance is not limited to the amount of the debt owing to the triggering creditor (here, the United States), but is expanded to satisfy the claims of all creditors. This is so according to MCAR because the power to avoid (found in sections 544, 547 or 548) is separate from the scope of avoidance (found in section 550).

The court agrees with MCAR that the Bankruptcy Code functions in this manner. *See Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 809 (9th Cir. 1994); *Liebersohn v. Internal Revenue Serv. (In re C.F. Foods, L.P.)*, 265 B.R. 71, 86 (Bankr. E.D. Pa. 2001); *Decker v. Voisenat (In re Serrato)*, 214 B.R. 219, 231 (Bankr. N.D. Cal. 1997). However, in the context of this case, the bifurcation of the avoidance power from the scope of the remedy leads to the argument that even though under the FDCPA the United States could only avoid transfers to the extent necessary to satisfy the IRS's $175,000 claim, MCAR can avoid transfers to the defendants to the extent of E$136,873,950 and then use that amount to satisfy not only the claims of creditors, but the claims of former equity holders of Mirant.

MCAR insists that this result should not trouble the court because the Bankruptcy Code operates precisely in the same manner when it comes to state fraudulent transfer statutes. *Acequia*, 34 F.3d at 810; *Harris v. Huff (In re Huff)*, 160 B.R. 256, 261 (Bankr. M.D. Ga. 1993). The court does not agree because while section 550 of the Bankruptcy

Code may have this preemptive effect when a trustee avoids transfers pursuant to state law under section 544(b), it is quite another thing for section 550 of the Bankruptcy Code to preempt section 3306(a)(1) of the FDCPA. When dealing with overlapping statutes, the court's duty is to harmonize them "to give effect to each one insofar as they are capable of co-existence and to preserve the sense and purpose of each, insofar as they are not manifestly incompatible." *Nw. Airlines Corp. v. Ass'n of Flight Attendants (In re Nw. Airlines Corp.)*, 349 B.R. 338, 373 (S.D.N.Y. 2006). Given the purpose of the FDCPA, its manifest intent to benefit only the United States, and the limited recovery thereunder, this court believes that the FDCPA can best be harmonized with sections 544(b) and 550 of the Bankruptcy Code by concluding that the FDCPA is not applicable law under section 544(b).

Additionally, if the FDCPA were construed to be applicable law under section 544(b), it could be co-opted by trustees in many cases and used to dilute the United States's recovery. For example, if a particular transfer were voidable only under the FDCPA, then the United States would receive 100% of any recovery. But if a bankruptcy trustee could avoid that same transfer under the FDCPA, it likely would reduce the recovery to the United States. That is because in any given case the distribution to the United States will depend upon the amount available for distribution and the size of the United States' claim in relation to all other claims.

Such a result is patently inconsistent with the FDCPA's express language and purpose. One would expect that had Congress intended such a result, it would have said so. Thus, in the final analysis, MCAR's position must be rejected not because it

impermissibly modifies the operation of Title 11 but because it impermissibly modifies the operation of the FDCPA.

There is another reason to reject MCAR's argument that failing to construe the FDCPA as applicable law impermissibly modifies section 544(b) by omitting the United States as a triggering creditor. Two courts have held that the enactment of the FDCPA does not limit the United States' right to avoid transfers under state law. *United States v. Maryans*, No. 592-401M, 1994 WL 681146, at *3 (N.D. Ind. 1994); *United States v. Carney*, 796 F.Supp. 700, 703 (E.D.N.Y. 1992). These holdings are premised upon section 3003 of the FDCPA, which says that "[t]his chapter shall not be construed to curtail or limit the right of the United States under any other Federal law or State law . . . to collect taxes or collect any other amount collectible in the same manner as a tax." 28 U.S.C. § 3003(b)(1). So, under these authorities the United States can be a triggering creditor under section 544(b) if it has standing to avoid the transfer under state law.

In *Hirsch v. Marinelli (In re Colonial Realty Co.)*, 168 B.R. 506 (Bankr. D. Conn. 1994), the court dealt with a statute similar to the FDCPA and reached the same result as this court, but for a different reason. In *Hirsch*, the court addressed the ability of a bankruptcy trustee to utilize 12 U.S.C. § 1821(d)(17) as applicable law under section 544(b). Section 1821 authorizes the FDIC as conservator or receiver for an insured depository institution to avoid transfers that are fraudulent as to the insured depository institution or the FDIC. *Hirsch*, 168 B.R. at 510. Any transfers so avoided are for the benefit of the insured depository institution. *Id.* at 510. In *Hirsch*, the court held that section 1812 avoidance powers are personal claims accruing only to the benefit of the FDIC. *Id.* at 511. Accordingly, it concluded they can be pursued for the benefit of the

FDIC alone and not for creditors at large. *Id.* Because the Supreme Court in *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 (1972), held that a trustee lacks standing to bring claims on behalf of specific creditors, the court dismissed the trustee's claims. *Hirsch*, 168 B.R. at 512. Whether one adopts this court's or the *Hirsch* court's reasoning, the conclusion is the same: the FDCPA is not applicable law under section 544(b) of the Bankruptcy Code.

MCAR argues that this conclusion is at odds with a decision by the United States Bankruptcy Court for the Middle District of Florida. MCAR correctly notes that in *Mills v. Gurley (In re Gurley)*, No. 95-00293 (Bankr. M.D. Fla. Aug. 15, 1997), the bankruptcy court found the FDCPA to be applicable law, and the court's decision was affirmed in both the district court and the court of appeals for the eleventh circuit. *Gurley v. Mills (In re Gurley)* No. 99-13416 (11th Cir. Sept. 20, 2000); *Gurley v. Mills (In re Gurley)*, No. 98-1169-Civ-Orl-18A (M.D. Fla. Aug. 9, 1999).

Like the Georgia District Court, this court does not view *Gurley* as persuasive authority on this issue. While the bankruptcy court in *Gurley* held that the FDCPA was applicable law under section 544(b), neither the district court nor the eleventh circuit court of appeals addressed that issue when they affirmed the bankruptcy court's decision. Moreover, it is not clear from the bankruptcy court's opinion that this issue was aggressively contested by any party. In *Gurley*, the United States was the largest, if not the only, creditor of the debtor. In fact, the United States urged the chapter 7 trustee to pursue the FDCPA claims on its behalf. In its opinion, the bankruptcy court applied the FDCPA to the facts of that case but did not discuss its analysis of how that act constituted