IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MC ASSET RECOVERY, LLC        §
                              §
V.                            §        ACTION NO. 4:06-CV-013-Y
                              §
                              §
COMMERZBANK AG, ET AL.        §

ORDER DENYING MOTION TO DISMISS BUT
GRANTING CONVERTED MOTION FOR SUMMARY JUDGMENT

Pending before the Court are the United States Bankruptcy Court's Proposed Findings of

Fact and Conclusions of Law (doc. 46) ("findings and conclusions"), filed July 20, 2010. After

reviewing the findings and conclusions, the parties' objections and responses, and conducting the

mandated de-novo review, this Court accepts in part and rejects in part the findings and conclusions.

*See* Fed. R. Bankr. P. 9033(d). Thus, this Court DENIES Defendants' Motion to Dismiss (Bankr.

R. 2271) and GRANTS Defendants' converted Motion for Summary Judgment (Bankr. R. 5188).


I. BACKGROUND

This case has a long and tortured history in this Court as well as the bankruptcy court.

Although the factual and procedural histories have been recounted multiple times in numerous

orders, this Court believes that reciting the facts and procedures again would be helpful to the parties

and to this Court as a reminder of the current posture of this case and the import of this order.

A. FACTUAL BACKGROUND

In December 2000, Mirant Asset Development and Procurement B.V. ("Mirant Europe"),

an indirect, wholly-owned subsidiary of Mirant Corporation ("Mirant"), entered into an agreement

with General Electric Company and General Electric International, Inc. (collectively, "GE"), for the

manufacture and purchase of nine equipment packages to be used in power-generation facilities in

Europe ("the master agreement"). Mirant executed a guaranty in favor of GE to secure Mirant Europe's obligations under the master agreement. European Power Island Procurement B.V. ("EPIP") was created to act as the owner of the power-generation facilities. Stichting European Power Island ("Stichting") was created to hold the corporate stock of EPIP.

Before making any payments under the master agreement with GE, Mirant Europe entered into a temporary off-balance-sheet financing transaction ("the bridge facility") with Westdeutsche LandesBank Girozentrale ("West LB"). The bridge facility was refinanced through another off-balance-sheet financing transaction, the €1.1 billion power-generation-facilities acquisition. These facilities consisted of facility I (a revolving facility that was the source of funding for progress payments under the master agreement) and facility II. Facility II would be drawn against only (1) if facility I was fully drawn down or (2) to fund certain facility II early-funding events. Defendants Commerzbank AG, New York and Grand Cayman Branches; ABN AMRO, N.V.; IntesaBci, S.p.A.; ING Bank; Royal Bank of Scotland; Danske Bank A/S; Australia and New Zealand Banking Group, Limited; Barclay's Bank; and BNP Paribas acted as lenders with respect to facility I. Commerzbank AG, Grand Cayman Branch; ABN AMRO; IntesaBci; and Credit Lyonnais acted as investors with respect to facility I. Commerzbank, New York and Grand Cayman Branches, and ABN AMRO acted as lenders with respect to the facility II loan. Commerzbank, Grand Cayman Branch, and ABN AMRO acted as investors with respect to facility II.

On February 15, 2001, Mirant Europe and West LB entered into an owner-assignment-and-assumption agreement, assigning all of Mirant Europe's interest in the master agreement to West LB. On May 25, EPIP and West LB entered into a purchase-option-and-assumption agreement ("the West LB assignment") assigning all of West LB's interest in the master agreement to EPIP. That same day, Mirant Europe, EPIP, Stichting, the lenders and investors in the facilities, and Commerzbank, New York Branch, as administrative agent, entered into a participation agreement

to finance the construction of the power-generation facilities. As part of the participation agreement, Mirant executed and delivered a guaranty in favor of Commerzbank, New York Branch. Mirant unconditionally guaranteed to Commerzbank all amounts payable by Mirant Europe under the participation agreement and the West LB assignment.

On August 13, Commerzbank syndicated the financing. Thus, Mirant Europe; EPIP; Stitching; the lenders and investors in the facilities; Commerzbank, New York Branch, as lead arranger, book manager, and administrative agent; and ABN AMRO, as co-lead arranger and syndication agent, entered into an amended participation agreement. The amended participation agreement required Mirant Europe to acquire the power-generation facilities from EPIP for a purchase price equal to the amount outstanding under the facilities. Mirant's guaranty remained in effect for all amounts due under the amended participation agreement. Under the amended participation agreement, advances were made to EPIP as the owner of the power-generation facilities. Both the original participation agreement and the amended participation agreement contained a jury-trial waiver. The parties agree that New York law governs the interpretation of the participation agreements. (Bankr. R. 5.)

In 2003, Mirant Europe decided that it could not use the power-generation facilities. Before GE had completed construction, Mirant Europe bought back its rights in the master agreement from EPIP under the purchase option. Mirant Europe then ended further construction under the master agreement. Mirant, either directly or through certain subsidiaries, paid Defendants €136,873,950 in connection with the power-generation facilities.

## B. PROCEDURAL HISTORY

On July 14, 2003, Mirant filed a voluntary petition for Chapter 11 bankruptcy protection. On July 13, 2005, Mirant, as debtor-in-possession, filed a complaint in its underlying bankruptcy case against the entities involved in the master agreement, the participation agreements, and the

guaranty, arguing that the payments made under these agreements were fraudulent transfers.[1]   On December 9, 2005, the bankruptcy court entered a confirmation order adopting a plan of reorganization, out of which emerged a reorganized Mirant ("New Mirant").   As part of the reorganization plan, plaintiff MC Asset Recovery ("MCAR") was formed as the litigation substitute to pursue the avoidance actions as successor to Mirant and as the representative of the Mirant debtors.  *See* 11 U.S.C.A. § 1123(b)(3)(B) (West 2004).  In the confirmation order, the bankruptcy court stated that "all Causes of Action, including Avoidance Actions . . . shall, upon occurrence of the Effective Date, be transferred to, and be vested in, New Mirant for the benefit of the Debtors and their Estates."  (Bankr. R. 14805.)  Defendants filed a jury demand and moved this Court to withdraw the automatic reference of MCAR's adversary proceeding to the bankruptcy court.  *See* 28 U.S.C.A. § 157(d) (West 1993); N.D. Tex. Misc. Order 33.

On December 17, 2007, while the motion to withdraw the reference was still pending in this Court, Defendants filed a motion under Federal Rule 12(b), parts (1) and (6), respectively, to dismiss MCAR's complaint for lack of subject-matter jurisdiction and for failure to state an actionable claim. On December 19, 2008, the bankruptcy court converted part of Defendants' motion to dismiss into a motion for summary judgment.  Specifically, because Defendants' choice-of-law issue required further discovery and the admission of proof outside the parties' pleadings, the bankruptcy court determined that this discrete portion of the dismissal motion should be treated as a motion for summary judgment.  *See* Fed. R. Civ. P. 12(d).

On March 27, 2009, this Court concluded that MCAR could not enforce the jury-trial waiver

---

[1]The defendants in Mirant's adversary action are Commerzbank, AG; Commerzbank AG, New York and Grand Cayman Branches; ABN AMRO, N.V.; IntesaBci, S.p.A.; ING Bank; Australia and New Zealand Banking Group Limited; ANZ Investment Bank; Barclay's Bank PLC; BNP Paribas; Credit Lyonnais; Danske Bank, A/S; ING Bank; Stitching; Mirant Europe; and The Royal Bank of Scotland, PLC.  The Court collectively will refer to these parties as "Defendants."  Mirant also sued GE; however, Mirant voluntarily dismissed its claims against GE with prejudice after they settled.  (Bankr. R. 5928-29.)

against Defendants, but denied the motion to withdraw the reference without prejudice until the completion of all pretrial proceedings. The Court stated that, if no other party to the waiver provision asserted it, Defendant could again move for withdrawal of the reference, which this Court would grant.

At this point, the bankruptcy court turned to Defendants' motion to dismiss and motion for summary judgment. The bankruptcy court noted that the manner in which it addressed the motions was an important query: "[S]hould this court enter an order granting or denying the motion (and thus subject the parties to the appellate procedures set forth in 28 U.S.C. § 158), or should it submit proposed findings of fact and conclusions of law to the District Court?" Ultimately, the bankruptcy court concluded that proposed findings of fact and conclusions of law regarding the motions should be submitted to this Court under Bankruptcy Rule 9033. *See* Fed. R. Bankr. P. 9033. This conclusion is further supported by the fact that the parties stipulated that this adversary action is a non-core proceeding (Bankr. R. 1476),[2] which mandates proposed findings and conclusions. *See id.* 9033(a).

In its final analysis, the bankruptcy court recommended that this Court deny the motions. The bankruptcy court's findings and conclusions are centered around three main concepts:

1. Because all of Mirant's creditors were not paid in full, MCAR had standing to prosecute the adversary action under 11 U.S.C. § 544(b).

2. Because the Federal Debt Collection Procedures Act ("the FDCPA") does not apply, a conflict-of-law analysis shows that New York law and not Georgia law applies to MCAR's ability to avoid the guaranty to Defendants.

3. Under New York law, MCAR's amended complaint plausibly stated a claim of fraudulent transfer.

---

[2]It is unclear why the parties so stipulated because § 157 provides that a fraudulent-transfer action is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(H).

No party was completely satisfied with the findings and conclusions; thus, MCAR and Defendants filed objections and objection responses as provided by Bankruptcy Rule 9033(b). Based on these objections, this Court will review the findings and conclusions de novo under Bankruptcy Rule 9033(d).

In addition to the findings recited above, the bankruptcy court found that if MCAR successfully avoided the transfers to Defendants, Defendants would have an allowed claim to recover the property from New Mirant under 11 U.S.C. § 502(h). New Mirant sought to intervene in the action in order to object to this portion of the findings and conclusions. The bankruptcy court denied the motion because MCAR adequately represented New Mirant's position. New Mirant filed an appeal from the intervention denial, which is the subject of a separate action. *See Mirant Corp. v. Commerzbank, AG*, No. 4:10-CV-614-Y (N.D. Tex. Aug. 25, 2010).

## II. STANDARDS OF REVIEW

Even under a de-novo review, this Court is bound by the settled review standards governing motions to dismiss and motions for summary judgment. These standards easily can be skirted in a case such as this where the facts and legal arguments occasionally and incorrectly entice fact finding.

### A. MOTION TO DISMISS UNDER RULE 12

Defendants move to dismiss MCAR's amended complaint based on MCAR's lack of standing (Rule 12(b)(1)) and based on MCAR's failure to state an actionable claim (Rule 12(b)(6)). (Bankr. R. 2300-2317, 2335-2343.) These are two distinct motions with different standards.

#### 1. Rule 12(b)(1)

A motion to dismiss under Rule 12(b)(1) challenges a federal court's subject-matter jurisdiction. If a plaintiff lacks standing to raise a claim, this Court has no subject-matter

jurisdiction over the claim. *See Whitmore v. Arkansas*, 495 U.S. 149, 154-55 (1990); *see also Barrett Computer Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 220 (5ᵗʰ Cir. 1989) (recognizing because standing presents jurisdictional question, standing analyzed under standards applicable to court's subject-matter jurisdiction). This Court must presume that a suit lies outside its limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking to invoke federal it. *See Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5ᵗʰ Cir. 2001).

This Court may dismiss for lack of subject-matter jurisdiction based on (1) the complaint alone, (2) the complaint supplemented by undisputed facts in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *See St. Tammany Parish ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 (5ᵗʰ Cir. 2009). Motions under Rule 12(b)(1) are categorized as either a facial attack or a factual attack upon subject-matter jurisdiction. *See Naranjo v. Universal Sur. of Am.*, 679 F. Supp. 2d 787, 792 (S.D. Tex. 2010). A facial attack requires this Court to inspect the pleadings, taking the allegations in the complaint as true, and determine whether the claimant has sufficiently alleged subject-matter jurisdiction. *See McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11ᵗʰ Cir. 2007). In other words, a facial attack simply challenges the court's subject-matter jurisdiction based on the sufficiency of the pleadings. A factual attack, by contrast, denies or controverts the plaintiff's allegations of jurisdiction. *See United States v. Ritchie*, 15 F.3d 592, 598 (6ᵗʰ Cir. 1994). Only uncontroverted factual allegations are accepted as true, and the plaintiff must establish subject-matter jurisdiction (in this case, standing) by a preponderance of the evidence. *See Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993); *Irwin v. Veterans Admin.*, 874 F.2d 1092, 1096 (5ᵗʰ Cir. 1989), *aff'd sub nom. Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1991).

## 2. Rule 12(b)(6)

The scope of the standard under Rule 12(b)(6) is more exacting than the standard for a Rule

12(b)(1) factual attack. Rule 12(b)(6) only authorizes the dismissal of a complaint that fails "to state a claim upon which relief can be granted." This rule must, however, be interpreted in conjunction with Rule 8(a), which sets forth the requirements for pleading a claim for relief in federal court. Rule 8(a)(2) calls for "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) (holding Rule 8(a)'s simplified pleading standard applies to most civil actions). As a result, "[a] motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). This Court must accept as true all well-pleaded, non-conclusory allegations in the complaint and liberally construe the complaint in favor of the plaintiffs. *See id.* In considering a motion to dismiss for failure to state a claim, "courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996).

The plaintiff must, however, plead specific facts, not mere conclusory allegations, to avoid dismissal. *See Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). Indeed, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," and its "factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 556 (2007). The plaintiff must plead facts "plausibly showing" its right to relief on each claim asserted. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1952 (2009). In other words, the plaintiff must "nudge[] [its] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### B. SUMMARY JUDGMENT AS TO CHOICE OF LAW

Which state's substantive law governs an issue is a question of law for this Court to decide.

*See Tow v. Rafizadeh (In re Cyrus P'ship)*, 413 B.R. 609, 612 (Bankr. S.D. Tex. 2008). But determining which state's contacts or interests control involves a factual determination. *See Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 204 (Tex. 2000). Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A party seeking summary judgment must show that there is no genuine issue of material fact as to fact questions necessary to determine the choice-of-law issue. *See Hughes Wood*, 18 S.W.3d at 204. Material facts are facts that could affect the outcome of the action or could allow a reasonable fact-finder to find in favor of the opposing party. *See DIRECTV, Inc. v. Budden*, 420 F.3d 521, 529 (5th Cir. 2005).

MCAR does not argue that there are material fact issues precluding summary judgment. Rather, MCAR and Defendants assert that the import of the largely-undisputed facts uncovered during discovery mandate different results. Thus, this Court's inquiry on summary judgment mainly is a legal one. *Cf. Grupo Televisa, S.A. v. Telemundo Commc'ns Group, Inc.*, 485 F.3d 1233, 1239 (11th Cir. 2007) (holding conflict-of-law issue presents legal question).

## III. DISCUSSION

### A. MCAR'S STANDING: RULE 12(B)(1)

A motion to dismiss for lack of subject-matter jurisdiction must be considered before any other challenge because jurisdiction must be present before this Court may determine the validity of a claim. *See Goldin v. Bartholow*, 166 F.3d 710, 714 (5th Cir. 1999); *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994). Defendants argue that MCAR does not have standing to avoid the disputed transactions because Mirant's creditors were paid in full under Mirant's Chapter 11 plan of reorganization. Thus, Defendants raise a factual attack on this Court's jurisdiction.

As noted by the bankruptcy court, Defendants' argument arises under an umbrella of unusual

procedural facts:

> In its plan of reorganization, Mirant provided that unsecured creditors would receive New Mirant stock and an interest in the recoveries of MCAR. Before Mirant confirmed its plan, [Bankruptcy] Judge Michael Lynn conducted a lengthy valuation hearing, after which he concluded that Mirant was solvent. Judge Lynn's valuation, coupled with rising prices in the energy market, generated significant interest in Mirant claims and equity. By the effective date of Mirant's plan, New Mirant's stock price supported an argument that unsecured creditors had been or would be paid in full on the basis of the stock alone.

> The issue of whether creditors had been paid in full began to arise in Mirant's bankruptcy case. Professionals who filed fee applications sought to justify their fees on the ground, among others, that creditors had been paid in full. . . . When Mirant sought approval of a settlement with Potomac Electric Power Company ("Pepco"), Mirant argued that certain objectors had no standing to oppose the settlement because their claims had been paid in full. . . .

> . . . MCAR . . . became concerned that Mirant's paid-in-full argument would undermine MCAR's [fraudulent-transfer] causes of action. . . . MCAR appeared at the hearing on Mirant's motion to settle with Pepco and urged Judge Lynn to exercise caution in ruling on the paid-in-full issue. . . .

> Judge Lynn approved Mirant's settlement with Pepco. In doing so, he ruled that the objecting creditors had standing to object under [§] 1109 of the Bankruptcy Code, even though creditors had been "satisfied in full" by Mirant's plan. Judge Lynn elaborated [that] what he meant by "satisfied in full" [was that stock valuation as of the effective date of the plan under § 1129(b)(2)(B)(i) should have no bearing on whether creditors are deemed fully satisfied for other purposes].

(Findings & Conclusions 11-12.) Based on these facts, Defendants assert that the doctrines of law of the case and judicial estoppel operate to deprive MCAR of standing. They further assert that the bankruptcy court's confirmation of Mirant's reorganization plan bars MCAR's avoidance claims by res judicata. (Defs. Obj. 7.) The bankruptcy court and Defendants agree that if Mirant's creditors were paid in full, MCAR lacks standing to prosecute the § 544(b) claims. (Defs. Obj. 7; Findings & Conclusions 14-16.) MCAR asserts that a debtor's avoidance powers vest on the petition date and any post-petition satisfaction of unsecured creditors does not affect a trustee's standing. (MCAR Obj. 6-7.)

The bankruptcy court held that Article III's limitation of federal-court jurisdiction to actual

cases or controversies demands that full payment of the debtor's creditors during the course of the debtor's case or under a plan confirmation renders any injury to those creditors conjectural or hypothetical. Indeed, this Court's jurisdiction is predicated on there being a case or controversy between the parties within the meaning or Article III. *See* U.S. Const. art. III, § 2; *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975). Such a case or controversy must exist throughout the litigation, i.e., the case cannot become moot and continue to establish standing. *See Samnorwood Indep. Sch. Dist. v. Tex. Educ. Agency*, 533 F.3d 258, 264 (5th Cir. 2008).

But MCAR's argument finds support in the bankruptcy statutes and the majority of the applicable law. A bankruptcy trustee, for the benefit of the entire estate, may avoid any transfer of the interest of a debtor in property or any obligation incurred by the debtor that is voidable by a creditor holding an unsecured claim that is allowable under the Bankruptcy Code. *See* 11 U.S.C. §§ 544(b), 550(a). An "allowable" claim is determined "as of the date of the filing of the petition." *Id.* § 502(b). The avoidance statute places the trustee in the shoes of the debtor's unsecured creditors. *See Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 809 (9th Cir. 1994). But there is a separation between avoiding a transfer and recovering from the transferee. *See id.* Thus, "after demonstrating the **right** to recover conveyances under [§] 544(b), a trustee must then establish the **amount** of recovery under [§] 550(a) . . . , which provides that, 'to the extent that a transfer is avoided under [§] 544 . . . , the trustee may recover, **for the benefit of the estate**, the property transferred.'" *Id.* (quoting 11 U.S.C. § 550(a)). The extent of the trustee's recovery is governed by § 550(a), which enables the trustee to pursue avoidance actions under § 544(b) if recovery will accrue "for the benefit of the estate." 11 U.S.C. § 550(a). This has been interpreted to fix the rights of holders of claims and interests as of the petition date. *See Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 527 (5th Cir. 2004). Further, § 541(a)(1) includes as property of the estate any property

available to the estate as of the commencement of the case.  *See id.* § 541(a)(1).

Several courts have determined that §§ 544(b) and 550(a) vest standing jurisdiction in a trustee to avoid a transfer as of the date of the petition.  *See Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 376 F.3d 819, 823-24 (8th Cir. 2004); *Acequia*, 34 F.3d at 809-12; *Silverman v. Sound Around, Inc.* (*In re Allou Distribs.*), 392 B.R. 24, 34-35 (Bankr. E.D.N.Y. 2008); *Alberts v. HCA, Inc. (In re Greater Se. Cmty. Hosp. Corp. I)*, 365 B.R. 293, 300-01 (Bankr. D.D.C. 2006); *MC Asset Recovery, LLC v. S. Co.*, No. 1:06-CV-417-BBM, 2006 WL 5112612, at *3-4 (N.D. Ga. Dec. 11, 2006). Indeed, "[a] debtor may use the [§] 544(b) powers after confirmation even though all of the unsecured creditors have been paid."  5 Collier on Bankruptcy ¶ 544.06[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010) (relying on *Acequia* and bankruptcy-appellate-panel order in *Stalnaker*).  This Court agrees with the bulk of the applicable case law and § 544(b) and concludes that a trustee's standing, in the context of avoidance actions to be exercised for the benefit of the estate (which includes more than solely the unsecured creditors), is determined as of the commencement of the adversary action.  *See generally Moore v. Bay*, 284 U.S. 4 (1931) (allowing trustee to stand in shoes of creditor to recover entire fraudulent-conveyance amount for benefit of all creditors even though creditor who could have avoided it subsequently owed only fraction of original amount).  This conclusion is buttressed by the fact that the confirmation plan provided that all avoidance actions expressly were vested in New Mirant as of the date of the confirmation. (Bankr. R. 14805.)  *See Greater Se. Cmty. Hosp.*, 365 B.R. at 300-01 (finding standing based on similar vesting language in reorganization plan).

This Court disagrees with the bankruptcy court that §§ 544(b) and 550(a) essentially are unconstitutional as applied based on a lack of standing when a trustee exercises its avoidance power after one constituency of the estate (unsecured creditors) has been satisfied post-petition.  (Findings

& Conclusions 10-16.) Section 544(b)'s provision that a trustee may avoid an unsecured claim that is "allowable" under § 502(e) dictates that the date of the commencement of the action is the operative date for determining standing. (MCAR Obj. 6-17.) Further, because the underlying basis for a trustee's standing to pursue an avoidance action derives from an injury to the estate, this Court determines that such injury continues even if the unsecured creditors are satisfied. (MCAR Obj. 17-32.)

Finally, and most importantly, the fact that the creditors were paid in New Mirant stock confers standing on MCAR to pursue the avoidance action based on the indirect benefit to the creditors from a more financially sound estate. *See Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80, 95, 97 (Bankr. S.D.N.Y. 2008), *aff'd*, 379 Fed. Appx. 10 (2$^d$ Cir. 2010); *see also Acequia*, 34 F.3d at 811-12 (discussing broad interpretations of "benefit the estate" in context of avoidance actions and fact that equity stake to creditors results in benefit to estate). The bankruptcy court relied on *Adelphia* to support its conclusion that if creditors are paid in full under a reorganization plan, a debtor has no standing to pursue avoidance actions. (Findings & Conclusions 15-16.) But *Adelphia* is distinguishable. The *Adelphia* court held that, because the creditors were paid in full with interest in cash (and **not** in shares of the reorganized corporation), it was impossible to conclude that the creditors would benefit by way of a more financially sound estate; thus, the recovery trust did not have standing to pursue an avoidance action. *See Adelphia*, 390 B.R. at 95, 97. In the instant case, the creditors were paid in stock; thus, the prospect of a more financially sound estate would provide MCAR with standing.

Article III is not offended by the bankruptcy statutes regarding avoidance actions. MCAR has standing to pursue the avoidance action; thus, Defendants' motion to dismiss under Rule

12(b)(1) is denied.[3]

## B. CHOICE OF LAW: RULE 56

The Court now turns to the portion of Defendants' motion to dismiss that the bankruptcy court converted into a summary-judgment motion: choice-of-law determination regarding avoidance of the guaranty. As the bankruptcy court explained:

> MCAR's case depends on its ability to avoid the guaranty to Commerzbank. MCAR concedes that the guaranty provides value for the payments made by Mirant to the defendants. Consequently, unless the guaranty is avoided, the payments made pursuant to it are insulated from [a fraudulent-conveyance] attack. Mirant delivered the guaranty more than one year prior to its petition in bankruptcy; thus, [§] 548 provides no basis for its avoidance. Therefore, MCAR must rely on an "applicable law" that it can access via [§] 544(b).

(Findings & Conclusions 19). Thus, this Court must determine whether Defendants have established, as a matter of law, the futility of MCAR's avoidance action.

### 1. "Applicable Law": FDCPA

Section 544(b) permits a trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable **under applicable law** by a creditor holding an unsecured claim." 11 U.S.C. § 544(b) (emphasis added). The bankruptcy court first determined that the Federal Debt Collection Procedures Act ("the FDCPA") was not "applicable law" under § 544(b) because it is a remedy available solely to the United States in its debt-collection

---

[3]Although the bankruptcy court recommended that the motion to dismiss based on standing be denied, the bankruptcy court based its recommendation on the fact that all inferences must be drawn in favor of MCAR in determining whether all creditors were paid in full. (Findings and Conclusions 17-19.) The Court need not address this recommendation. However, the Court notes that it appears the bankruptcy court reviewed Defendants' 12(b)(1) standing arguments under the review standard for motions raised under Rule 12(b)(6). Specifically, the bankruptcy court held that, by drawing all inferences in favor of MCAR's standing, it could not conclude that MCAR lacked standing. In a Rule 12(b)(1) analysis as opposed to a Rule 12(b)(6) review, however, the court must resolve disputed issues of fact and not draw all inferences in favor of MCAR's standing, especially in a factual attack. But the Court agrees with the bankruptcy court that the creditors were not paid in full because they were paid in stock and because the plan expressly stated any avoidance action vested in MCAR for the benefit of Mirant and its debtors. (Bankr. R. 14875.)

14

efforts. (Findings & Conclusions 20-30.) MCAR objects and asserts, among other arguments, that the disputed language in the FDCPA[4] means that the FDCPA is the exclusive remedy for the United States and not that the FDCPA is for the exclusive use of the United States. Defendants persuasively argue why the bankruptcy court was correct to hold that the FDCPA does not contain a private right of action. (Defs. Resp. 16-27.) There is no need to repeat Defendants' arguments here. This Court agrees with the bankruptcy court and Defendants that the FDCPA is a remedy for the exclusive use of the United States; thus, the FDCPA is not applicable law to MCAR's avoidance action.

2. "Applicable Law": Georgia UFTA, Georgia section 18-2-22, or New York law

Because the FDCPA does not apply to MCAR's avoidance actions, it must be determined what law applies under § 544(b) in deciding MCAR's avoidance action. Defendants argue section 18-2-22 of the Official Code of Georgia applies. MCAR asserts either Georgia's Uniform Fraudulent Transfer Act ("UFTA") law, which replaced section 18-2-22 on July 1, 2002, or New York law applies. MCAR acknowledged in the bankruptcy court that because Georgia's section 18-2-22 does not provide for the avoidance of guaranties, MCAR's avoidance claim would be barred if that section applies and neither the UFTA nor New York law applies. (Findings & Conclusions 3.) Both the UFTA and New York law provide for the avoidance of guaranties. This Court, therefore, is faced with a possibly case-dispositive, choice-of-law analysis in the context of a summary-judgment motion.[5]

After applying the choice-of-law factors provided by sections 6 and 145 of the Second Restatement of Conflict of Laws, the bankruptcy court concluded that although section 18-2-22 was

---

[4]The FDCPA provides that its procedures to avoid fraudulent transfers apply "as to a debt to the United States" and provide remedies to the United States. 28 U.S.C. §§ 3304(a)-(b), 3306(a).

[5]The parties have adduced into evidence the product of "significant discovery" on the choice-of-law issue, mandating the conversion of this portion of the motion to dismiss into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). (Findings & Conclusions 4.)

the applicable law of Georgia,[6] New York law should apply to MCAR's avoidance action under sections 6 and 145 because New York law best serves the fundamental purpose of fraudulent-transfer law: the protection of creditors. (Findings & Conclusions 31-54.) Defendants object to this conclusion and assert Georgia's section 18-2-22 applies to bar MCAR's avoidance action. (Defs. Obj. 31-40.)

### a. Basic choice-of-law principles

As discussed by the bankruptcy court, federal choice-of-law principles apply to this case: "The federal choice-of-law rule is the 'independent[-]judgment' test, which is a 'multi-factor, contacts analysis' that applies the law of the state with the most significant relationship to the transaction at issue. *In re Consol. Capital Equities Corp.*, 143 B.R. 80, 85 (Bankr. N.D. Tex. 1992)." (Findings & Conclusions 31-32.) Texas applies the Restatement's most-significant-relationship test to decide choice-of-law issues. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000). The independent-judgment test and the most-significant-relationship test are the same; thus, this Court will consult Texas law in determining which law applies to MCAR's avoidance action. *Cf. Tow*, 413 B.R. at 614-15 (concluding federal choice-of-law rules apply to fraudulent-transfer action brought in bankruptcy case and stating federal test and Texas test synonymous).

Fraudulent-transfer actions arise in tort; therefore, Texas courts rely on section 6 and section 145 of the Restatement in determining choice-of-law issues arising in such an action.[7] *See,*

---

[6]MCAR does not object to the bankruptcy court's conclusion that Georgia's UFTA does not apply. MCAR focuses its objections on the bankruptcy court's analysis of the section 145 factors. (MCAR Obj. 63-64.)

[7]Defendants object and assert that, in a tort action, a court should look only to section 145 to determine which law applies. (Defs. Obj. 27-29.) However, Texas courts have consistently held that the most-significant-relationship test considers both section 6 and section 145. *See Cates v. Creamer*, 431 F.3d 456, 465 (5th Cir. 2005); *Torrington Co.*, 46 S.W.3d at 848; *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979); *see also* Restatement (Second) Conflict of Laws § 145 cmt. b; James P. George, *False Conflicts and Faulty Analyses: Judicial Misuse of Governmental Interests*

*e.g.*, *Faulkner v. Kornman (In re The Heritage Org., LLC)*, 413 B.R. 438, 462 (Bankr. N.D. Tex. 2009); *Torrington*, 46 S.W.3d at 848. Under section 6, the Restatement enumerates several considerations relevant to a choice-of-law analysis: (1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability, and uniformity of result; and (7) ease in the determination and application of the law to be applied. *See* Restatement (Second) of Conflict of Laws § 6(2) (2010). In a tort case, such as a fraudulent-transfer action, section 145 lists four inquiries to determine the applicable law: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *See id.* § 145(2) (2010). These factors are to be evaluated qualitatively and quantitatively. *See Cates*, 431 F.3d at 464.

b. Application of sections 145 and 6

(1) section 145

(a) where injury occurred: Georgia

First, this Court considers the place where the injury occurred. The injury sought to be redressed is the alleged fraudulent transfers under the guaranty. The bankruptcy court concluded that the injury occurred in Georgia, the location of Mirant's headquarters. (Findings & Conclusions 37-38.) MCAR argues that the injury occurred in New York because the guaranty became effective when all deliveries were made to Commerzbank's New York counsel and because the loan was

*in the Second Restatement Conflict of Laws*, 23 Rev. Litig. 489, 519-24 (2004).

closed, funded, and administrered in New York. (MCAR Obj. 67-73.) This Court agrees with Defendants and the bankruptcy court that the injuries occurred in Georgia for the reasons stated by the bankruptcy court and Defendants. (Findings & Conclusions 37-38; Bankr. R. 5978-79; Defs. Resp. 27-30.) The degrading of the economic well-being of the transferor—the injury flowing from the guaranty—occurred where Mirant had its principal place of business.

### (b) where injury-causing conduct occurred:  Georgia

Second is a determination of where the conduct causing the injury occurred.  The bankruptcy court determined that any culpable conduct occurred at Mirant's headquarters in Georgia, where Mirant's management decided to issue the guaranty.  (Findings & Conclusions 37.)  MCAR asserts that the conduct occurred in New York because the majority of the negotiations were conducted in New York, most of the key documents were drafted in New York, the loan was closed and funded in New York , and the guaranty was only effective upon delivery in New York.  (MCAR Obj. 74-77.)  Defendants compellingly argue in their summary-judgment motion and in their response to MCAR's objections that the conduct leading to the injury occurred in Georgia.  (Bankr. R. 5979-80; Defs. Resp. 30-33.)  The injury to the estate—Mirant's failure to pay its debts—was caused by the conduct of Mirant at its corporate headquarters in Georgia.  Indeed, Defendants provided the funding at Mirant's request based on Mirant's representations (which were grounded in Mirant's superior knowledge of its own financial condition) of its ability to pay debts as they became due.  The collection of loan documents by Defendants was merely ministerial and cannot be the conduct that caused the alleged injury.  Based on these reasons, this Court concludes that the culpable conduct occurred in Georgia.  (Findings & Conclusions 36-37.)

### (c) location of parties:  Georgia

Third, this Court looks to the domicile, residence, nationality, place of incorporation, and

place of business of the parties. The bankruptcy court concluded that Georgia law applied under this factor. (Findings & Conclusions 33-34, 51.) This Court agrees that Mirant's principal place of business was in Georgia and that Defendants' foreign domiciles and principal places of business do not affect this inquiry. *See* Restatement (Second) Conflict of Laws § 145 cmt. e (stating in business torts, place of business of parties is the more important contact). But the parties fought mightily on the location of the creditors and whether creditors could even be considered in this analysis because they were not parties to the guaranty.

MCAR proffered as summary-judgment evidence the affidavit of Carianne Basler who, after reviewing the creditors' proofs of claim, concluded that although New York creditors held 99.175% of the dollar amount of claims against Mirant, a plurality (35.164%) of the claims were held by Georgia claim holders. Defendants sought to strike Basler's affidavit because (1) the affidavit was not relevant to the choice-of-law issue, (2) the affidavit was not the best evidence of the location of the creditors, and (3) Basler was not qualified to provide expert analysis. *See* Fed. R. Evid. 401, 702, 1002. (Bankr. R. 13544-59.) The bankruptcy court denied the motion, but reserved "the issue of whether or not the information . . . is in fact relevant . . . as part of the ultimate summary-judgment determination" and viewed the affidavit as a permissible summary under Rule 1006. (Bankr. R. 16816-17.) In its findings and conclusions regarding the motion for summary judgment, it appears that the bankruptcy court concluded that Basler's affidavit was relevant and admissible, but that this factor nevertheless militated in favor of the application of Georgia law because more claim holders were located in Georgia. (Findings & Conclusions 34-36, 51.) Contrary to MCAR's objections, this conclusion is supported by the fact that the Restatement provides that in business- or financial-interest cases, the place of business is the more important contact regarding this factor. *See* Restatement (Second) Conflict of Laws § 145 cmt. e. (MCAR Obj. 79-83.)

Initially, this Court notes that consideration of the location of most of the transferor's creditors is appropriate in determining a choice-of-law issue. *See* 3 Howard J. Steinberg, Bankruptcy Litigation § 17:112 (2010). As stated above, MCAR relied on Basler's affidavit to establish that New York law should apply under this factor based on the location of the creditors. However, the bankruptcy court concluded that this factor weighs in favor of the application of Georgia law based on Basler's assertion that the number of creditors located in Georgia was greater than the number of creditors located in New York. Because the bankruptcy court concluded that Georgia law applied in the context of its section 145 analysis, there is no need to address Defendants' evidentiary objections to the Basler affidavit. In other words, because the bankruptcy court ruled in Defendants' favor regarding this factor of section 145, this Court need not discuss Defendants' objections to the affidavit because they are moot.

(d) center of relationship: Georgia

Finally, this Court considers the place where the relationship, if any, between the parties is centered. The bankruptcy court held that this factor weighed in favor of neither Georgia nor New York:

> The parties disagree about the place where the relationship was centered. Commerzbank focuses on the fact that its Atlanta agency was the relationship manager with Mirant. MCAR focuses on the fact that the financing transaction was centered in New York.
>
> After giving due consideration to both the quantity and quality of the contacts in Georgia and New York, the court cannot conclude that one set of contacts dominates over the other. Moreover, as one court has pointed out the real parties-in-interest in a fraudulent conveyance, the creditors and the transferee, usually have not dealt directly with each other at all. [*See Ferrari v. Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 108 B.R. 384, 387 (Bankr. D. Mass. 1989)]. So, there is no "relationship" to center upon. Accordingly, the court regards this factor as neutral.

(Findings & Conclusions 38-39.) But as noted by MCAR and Defendants, it would be "rare that the

injury, the conduct producing it, and the parties' domiciles would point to the same . . . state, yet the relationship would somehow be centered in [a different state]." *CPS Int'l, Inc. v. Dresser Indus., Inc.*, 911 S.W.2d 18, 30 (Tex. App.—El Paso 1995, writ denied).  (MCAR Obj. 83; Defs. Resp. 36.) For the reasons espoused by Defendants in their summary-judgment motion and their response to MCAR's objections, this Court concludes that the relationship between the parties is centered in Georgia.  (Defs. Resp. 36-38; Bankr. R. 5966-73.)

(2)  Section 6

In analyzing the section 6 factors, the bankruptcy court concluded that New York law applied to the fraudulent-conveyance action.  (Findings & Conclusions 39-51.)  Defendants object and assert that the factors actually point to the applicability of Georgia law.  (Defs. Obj 31-40.)  In tort cases, the Restatement instructs that protection of justified interests and certainty of result are of lesser importance than the other section 6 factors.  *See* Restatement (Second) Conflict of Laws § 145 cmt. b.

(a) basic policies of fraudulent conveyances<br>and relevant policies of interested states:  New York[8]

Fraudulent-transfer law in the bankruptcy context focuses on the preservation of the assets of the estate, specifically to benefit unsecured creditors.  *See Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 195 (S.D.N.Y. 2002); *Brandt v. nVidia Corp. (In re 3dfx Interactive, Inc.)*, 389 B.R. 842, 863 (Bankr. N.D. Ca. 2008); *Official Comm. of Equity Sec. Holders of Mirant Corp. v. Wilson Law Firm, P.C. (In re Mirant Corp.)*, 334 B.R. 787, 798 n.27 (Bankr. N.D. Tex. 2005).  The policy undergirding a state's fraudulent-transfer law, likewise, is the prevention of the diminution of a

---

[8]This factor encompasses two considerations laid out by section 6: (1) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue and (2) the basic policies underlying the particular field of law.

debtor's estate as viewed by the debtor's creditors. *See Lustig v. Weisz & Assocs., Inc. (In re Unified Commercial Capital, Inc.)*, 260 B.R. 343, 352 (Bankr. W.D.N.Y. 2001). In short, this factor considers the government's interest; i.e., the purpose behind a state's law is considered in the context of choosing the governing law. *See* George, *False Conflicts*, *supra*, at 495, 511, 586 (arguing government-interest analysis not separate test, but one element in Restatement's multifactored test). But this factor is not overriding and cannot negate or ignore the section 145 factors or the other section 6 factors. *See* Restatement (Second) Conflict of Laws § 145 cmt. c (stating purpose of applicable tort rule "must not be over-emphasized"); George, *False Conflicts*, *supra*, at 551-52 (noting skewing of conflicts analysis if policies or governmental interests are given too much focus).

This Court believes that the bankruptcy court, as Defendants point out, placed undue weight on the fact that the purpose of New York's fraudulent-transfer law protected the bankruptcy estate while Georgia's law did not. (Findings & Conclusions 44-47; Defs. Obj. 31-35.) Although the bankruptcy court stated that it did not intend the policy considerations to overwhelm the section 145 factors, it concluded that New York law prevailed mainly because it most protected the bankruptcy estate. (Findings & Conclusions 53-54.) Although this Court agrees with the bankruptcy court that New York law best embodies the purpose behind fraudulent-transfer law in bankruptcy cases, this Court will not give this factor determinative weight.[9] *See id.* Indeed, it appears that the bankruptcy court's approach "open[ed] a door to applying whichever state's law provides the most expansive rights for creditors to recover." (Defs. Obj. 33.) This is an outcome not desired by the Restatement:

[9]The danger of heavily weighting the government's interest in a conflict analysis has been aptly summarized:

[A] far larger problem in state and federal courts throughout the United States is significant deviation from the Second Restatement's multifactored test to single-factor tests, directly caused by the persistence of two radically different methodologies—the First Restatement's territorially fixed lex locus test and Brainerd Currie's governmental-interest analysis.

George, *False Conflicts*, *supra*, at 491. The governmental-interest analysis, which looks to policy concerns, cannot overpower the most-significant-relationship test that this Court is bound to apply.

"A rule [that] exempts the actor from liability for harmful conduct is entitled to the same consideration in the choice-of-law process as is a rule [that] imposes liability."  Restatement (Second) Conflict of Laws § 145 cmt. c.

(b) relevant policies of the forum:  not applicable

Texas fraudulent-transfer law is not a factor in this case.  Texas's only contact with this case is being the place of trial; thus, Texas's interest is limited to procedural issues.  *See id.* § 6 cmt. e.

(c) protection of justified expectations:  Georgia

This factor applies when one party has justifiably molded its conduct to conform to the requirements of a particular law.  *See id.* cmt. g.  In a fraudulent-transfer action, however, the creditors and the transferee have had no dealings with each other and, thus, would not have anticipated the application of a certain forum's law; but both have dealt with the debtor and the debtor's assets. *See Morse Tool*, 108 B.R. at 387.  This Court reasonably would look to the location of the debtor in determining the protection of justified expectations. *See In re Revco D.S., Inc.*, 118 B.R. 468, 503 n.10 (Bankr. N.D. Ohio 1990); *Morse Tool*, 108 B.R. at 387.  As previously stated, Mirant was located in Georgia.  Thus, all parties would expect that Georgia law would be the governing law for any fraudulent-transfer action.  (Defs. Obj. 35-36.)

(d) certainty, predictability, and uniformity of result:  Georgia

The bankruptcy court, although recognizing that *Morse Tool* would point to the application of Georgia law in the context of this factor, found that "greater predictability and uniformity can be achieved by placing less emphasis on the location of the transferred asserts and more emphasis on the policies underlying fraudulent[-]transfer law [because] it is far easier to identify the law that best implements creditor protection than the state where the transferred assert was located."  (Findings

& Conclusions 49.)  But this approach seems to conflate the predictability factor with the policies factor discussed above.  The bankruptcy court, thus, makes policy considerations the predominant factor of its conflicts inquiry.  As discussed above, this Court respectfully disagrees with this approach.  *See* George, *False Conflicts*, *supra*, at 585-86.  Although the factors may be given different weight in this Court's ultimate qualitative analysis, the policy factor cannot be allowed to overwhelm the others.  *See generally* Restatement (Second) Conflict of Laws § 6 cmt. c (stating "[v]arying weight will be given to a particular factor").  This Court agrees with Defendants that predictability and foreseeability would be served best by the application of Georgia law.  *See Morse Tool*, 108 B.R. at 387.  (Defs. Obj. 37.)

(e) ease of determination and application of law to be applied:  New York

As noted by the bankruptcy court, the Restatement provides that "choice-of-law rules should be simple and easy to apply."  Restatement (Second) Conflict of Laws § 6 cmt. j.  (Findings & Conclusions 49.)  The Restatement goes on to caution that this factor "should not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results."  *Id.*

The bankruptcy court concluded that this factor favored New York law because simplicity and ease are "best served in fraudulent[-]transfer cases by applying that law that best fulfills the underlying policies of fraudulent[-]transfer law."  (Findings & Conclusions 49.)  Once again, the bankruptcy court, by focusing primarily on policy considerations, appears to have fused the policy factor with a separate section 6 factor.  However, the Court agrees with the bankruptcy court's conclusion and MCAR's reasoning that application of New York's fraudulent-transfer law would result in more ease and simplicity.  (MCAR Obj. 93-94.)  *Cf. Seth v. Seth*, 694 S.W.2d 459, 462-64 (Tex. App.—Fort Worth 1985, no writ) (applying Texas law in divorce case after conducting section

24

6 conflicts analysis because applying Islamic law would produce a harsh result).

(f) needs of interstate and international systems:  New York

This factor should "seek to further harmonious relations between states and to facilitate commercial intercourse between them" and functions "to make the interstate and international systems work well."  Restatement (Second) Conflict of Laws § 6 cmt. d.  The bankruptcy court concluded that this factor pointed to the application of New York law:

> This factor also points to a choice-of-law rule that emphasizes facilitating the underlying policies of the competing state, rather than merely defaulting to a contacts-based analysis.  If the fundamental policy of fraudulent[-]transfer law can be fulfilled by applying a law that does not offend the underlying policies of either state, then the law of that state should govern.  Here, that law is New York law.

(Findings & Conclusions 51.)  This Court agrees with MCAR that because the UFTA, which allows the avoidance of obligations, has been adopted by the majority of states, the law that embodies the UFTA applies under this factor.  (MCAR Obj. 88.)  Indeed, Georgia adopted the UFTA in 2002.  Harmonious relations between the states would be fostered by application of New York law, which, like the majority of states, allows the avoidance of obligations in this situation.

c.  Summary of choice-of-law conclusion:  Georgia

Based solely on a quantitative analysis, the section 145 factors heavily weigh in favor of the application of Georgia law, while the section 6 factors weigh in favor of New York law.[10]  However, this Court should focus on the factors that "capture the parties' more qualitative relationship in the context of a fraudulent-transfer dispute."  *ASARCO, LLC v. Americas Mining Corp.*, 382 B.R. 49, 64 (S.D. Tex. 2007).  Additionally, the section 145 contacts are to be weighed according to the principles of section 6, which provide basic policy considerations to aid the court in determining the

---

[10]Two of the section 6 factors point to the application of Georgia law.  But, as stated above, these two factors are to be given less weight in a fraudulent-transfer case.

appropriate law.  *See Price v. Litton Sys., Inc.*, 784 F.2d 600, 603 (5th Cir. 1986); *Estate of Pigorsch ex rel. Martin v. York College*, ____ F. Supp. 2d ____, 2010 WL 3328284, at *5 (N.D. Iowa Aug. 18, 2010); *cf. ASARCO*, 382 B.R. at 64 (failing to conduct section 6 analysis after section 145 analysis strongly pointed to application of Delaware law).  It appears the section 145 factors are narrower and more fact specific than the section 6 factors and, thus, should take a leading role in determining choice of law, with section 6 providing a basic framework under which to qualitatively analyze the section 145 factors.  *See, e.g., Bonn Operating Co. v. Devon Energy Prod. Co.*, No. 4:06-CV-734-Y, 2009 WL 484218, at *7-8 (N.D. Tex. Feb. 26, 2009), *aff'd on other grounds*, 613 F.3d 532 (5th Cir. 2010); *Moorehead v. Mitsubishi Aircraft Int'l, Inc.*, 639 F. Supp. 385, 390 (E.D. Tex. 1986), *aff'd in part & rev'd in part on other grounds*, 828 F.2d 278 (5th Cir. 1987); George, *False Conflicts*, *supra*, at 519-21.  Indeed, the bankruptcy court recognized that if the section 145 factors point to one state, the section 6 factors must take a secondary role:

> Any fraudulent transfer choice-of-law analysis should involve consideration of the factors in section 145.  If nothing else, that analysis should reduce the number of states with significant contacts to a manageable number.  In some cases the contacts may point so overwhelmingly to one state that the policy considerations in section 6 do not outweigh the significance of the physical contacts. *See[,] e.g., Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 404-05 (5th Cir. 2004); *Askanase v. Fatjo*, 130 F.3d 657, 671 (5th Cir. 1997); *Warfield [v. Carnie*, No. 3:04-CV-633-R,] 2004 WL 1112591, at *8 [(N.D. Tex. Apr. 13, 2007)]; *Consol. Capital Equities*, 143 B.R. at 85.

(Findings & Conclusions 53-54.)  However, this Court disagrees with the bankruptcy court's conclusion that because a fraudulent-transfer case in the bankruptcy context is brought to protect the creditors, the policy considerations of section 6 should get "the nod."  (Findings & Conclusions 53-54.)  This approach basically exempts fraudulent-transfer actions from the choice-of-law provisions of section 145.  As the bankruptcy court states, the contact factors of section 145 should not be construed so as to become irrelevant.  (Findings & Conclusions 53.)  Looking at the quality

of the parties' contacts, this Court concludes Georgia law should apply. As asserted by the bankruptcy court, the parties' contacts strongly favor applying Georgia law:

> Here, the contacts of the parties favor Georgia law. Mirant has its principal place of business in Georgia, the injury occurred there, and the conduct causing the injury occurred there. Although the greatest percentage of claims is held by creditors in New York, more claim holders are in Georgia than New York. Ultimately, both the quantity and quality of contacts between the parties favor applying Georgia law.

(Findings & Conclusions 51.)

This Court is mindful of the fact that the choice-of-law issue arises in the context of a bankruptcy action. As such, this Court must not ignore that the bankruptcy code embodies a policy of obtaining a maximum and equitable distribution for creditors. *See Stellwagen v. Clum*, 245 U.S. 605, 617 (1918); *Mut. Benefit Life Ins. Co. v. Pinetree, Ltd. (In re Pinetree, Ltd.)*, 876 F.2d 34, 36 (5th Cir. 1989). But to vault this policy over and above the section 145 choice-of-law factors would be imprudent and would render the Restatement conflicts analysis toothless in bankruptcy cases. In other words, such a choice-of-law analysis would deteriorate into a simple inquiry into which state's law would give the estate the maximum recovery. This Court is not willing to de-emphasize section 145. Additionally, because section 6 seems to be a framework under which to evaluate the contacts identified under section 145, the section 6 factors become less useful or relevant when the section 145 inquiry identifies only one state with sufficient contacts to justify application of that state's law to the parties' dispute.

### d. Which Georgia law: the UFTA or section 18-2-22

Now that this Court has determined that Georgia law should apply to the avoidance actions under a conflicts analysis, it must be decided which law of Georgia applies: the UFTA, which allows fraudulent-transfer actions, or section 18-2-22, which does not. At the time Mirant executed and

delivered its guaranty to Defendants, section 18-2-22 was in effect.  As stated above, the bankruptcy court concluded that section 18-2-22 applied to MCAR's fraudulent-transfer actions if Georgia law applied under a choice-of-law analysis.  (Findings & Conclusions 43.)  MCAR did not object to this conclusion.  Indeed, this Court agrees with the bankruptcy court that section 18-2-22 should govern MCAR's fraudulent-transfer action, which challenged transfers that occurred before the effective date of the UFTA.  Thus, MCAR's fraudulent-transfer action is barred under section 18-2-22.

### C.  REMAINING ARGUMENTS: RULE 12(b)(6)

The bankruptcy court, after concluding New York law applied to MCAR's fraudulent-transfer action, found the remaining arguments in Defendants' motion to dismiss to be without merit:

1. MCAR's amended complaint does not reflect that Mirant received fair consideration for the transfer.

2. MCAR's amended complaint does not reflect that Mirant was solvent at the time of the transfer.

3. The plan confirmation does not bar MCAR's fraudulent-transfer action under the res-judicata doctrine.

4. MCAR's amended complaint does not reflect an absence of benefit to the estate.

5. MCAR's amended complaint states a claim under § 550(a) as to two cash transfers made to Mirant Investments, B.V.

6. MCAR's amended complaint states a claim for relief under § 548.

(Findings & Conclusions 54-65.)  But because this Court has concluded that Georgia law applies, which does not allow MCAR to avoid the allegedly fraudulent transfers, the Court need not address Defendants' objections.

## IV.  CONCLUSION

This Court determines that MCAR has standing to pursue its fraudulent-transfer action against Defendants.  But because Georgia law applies, MCAR cannot seek to avoid the pre-petition transfers.  Thus Defendants' motion to dismiss is denied, but Defendants' converted motion for summary judgment is granted.  MCAR's fraudulent-transfer claims must be dismissed.

SIGNED December 22, 2010.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE